

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-24-1999

# Matteo v. Supt SCI Albion

Precedential or Non-Precedential:

Docket 96-2115

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

## Recommended Citation

"Matteo v. Supt SCI Albion" (1999). *1999 Decisions*. Paper 78.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/78

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Volume 2 of 2

Filed March 24, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-2115

ANTHONY N. MATTEO,
        Appellant

v.

SUPERINTENDENT, SCI ALBION;
THE DISTRICT ATTORNEY OF THE COUNTY OF
CHESTER; THE ATTORNEY GENERAL OF THE
STATE OF PENNSYLVANIA

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 96-cv-06041
(Honorable Joseph L. McGlynn, Jr.)

Argued January 30, 1998
Before: MANSMANN, COWEN and RENDELL, Circuit Judges

Argued En Banc November 23, 1998
Before: BECKER, Chief Judge, SLOVITER, STAPLETON,
GREENBERG, SCIRICA, NYGAARD, ALITO, ROTH, LEWIS,
McKEE, RENDELL and COWEN, Circuit Judges

(Filed March 24, 1999)

BECKER, Chief Judge, concurring.

I agree that the order of the District Court denying Matteo's application for writ of habeas corpus should be affirmed, because, whether the interpretation of AEDPA applied by the majority or the one that I would apply is correct, the decision of the state court that Lubking was not a government agent at the time of the telephone calls and that the incriminating statements were not deliberately elicited by the police cannot be set aside. I also agree that any error was harmless. I therefore join in Parts III and IV of the majority opinion.

I disagree with the majority, however, as to the correct legal standard for reviewing state court decisions under S 2254(d)(1). I believe that the majority's approach, which I see as expanding the availability of plenary review under S 2254(d)(1), fails to ensure that federal habeas courts grant state court decisions the deference S 2254(d)(1) requires. In addition to explaining why I believe that the O'Brien standard adopted by the majority is incorrect, I also set forth my reasons for believing that we should adopt instead a modified version of the standard announced by the United States Court of Appeals for the Fourth Circuit in Green v. French, 143 F.3d 865 (4th Cir. 1998), cert. denied, 119 S. Ct. 844 (1999).[1]

I.

The signal difference between the two approaches is the amount of deference they afford to state court decisions. In Green, the court set out an elaborate categorization of

_____

1. The majority rightly rejects the other approach adopted by various courts, exemplified by Lindh v. Murphy, 96 F.3d 856, 870 (7th Cir. 1996), revd. on other grounds,521 U.S. 320 (1997). See also Drinkard v. Johnson, 97 F.3d 751, 767 (5th Cir. 1996), cert. denied, 520 U.S. 1107 (1997). Under Lindh, a habeas court would apply plenary "contrary to" review to purely legal questions and deferential"unreasonable application of " review to mixed questions of law and fact. The Lindh bifurcated standard of review represents an improper reading of S 2254(d)(1), because it is inconsistent with the text and legislative history of S 2254(d)(1). See O'Brien v. Dubois, 145 F.3d 16, 22 (1st Cir. 1998) (discussing this problem with the Lindh approach).

cases in which the two parts of S 2254(d)(1) apply. It specified when plenary review under the "contrary to" clause should apply, and when deferential "unreasonable application of" review should apply:

> [A] decision is "contrary to" precedent only when, either through a decision of pure law or the application of law to facts indistinguishable in any material way from those on the basis of which the precedent was decided, that decision reaches a legal conclusion or a result opposite to and irreconcilable with that reached in the precedent that addresses the identical issue. In contrast, a decision represents an "unreasonable application of " precedent only when that decision applies a precedent in a context different from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is not reasonable, when that decision fails to apply the principle of a precedent in a context where such failure is unreasonable, or when that decision recognizes the correct principle from the higher court's precedent, but unreasonably applies that principle to the facts before it (assuming the facts are insufficiently different from those that gave rise to the precedent as to constitute a new context for consideration of the principle's applicability).

Green, 143 F.3d at 870; accord Davis v. Kramer, 167 F.3d 494, 500 n.8 (9th Cir. 1999) (defining cases in which S 2254(d)(1) would require a grant of habeas relief) (citing Green), petition for cert. filed, 65 U.S.L.W. 3570 (Mar. 8, 1999) (No. 98-1427). Thus, under Green, where the Supreme Court has established a rule but not specified how it should apply in the specific factual circumstances at issue, a federal habeas court would review a state court decision under a deferential reasonableness standard.

The majority adopts the O'Brien standard, under which "[t]he critical question is `whether a Supreme Court rule -- by virtue of its factual similarity (though not necessarily identicality) or its distillation of general federal law precepts into a channeled mode of analysis specifically intended for application to variant factual situations -- can fairly be said to require a particular result in a particular case.' " Slip Op.

39

at 20 (quoting O'Brien v. Dubois, 145 F.3d 16, 25 (1st Cir. 1998)). But query what would happen if a Supreme Court case provided a clear rule, but did not dictate how that rule should apply in particular factual situations? I cannot find an answer to this question in the majority's decision, but as I read O'Brien, from which the majority draws its overall approach, the First Circuit would apply plenary review under the "contrary to" standard even where Supreme Court precedent dictates a controlling general rule without applying it to particular facts. See O'Brien, 145 F.3d at 24 ("First, the habeas court asks whether the Supreme Court has prescribed a rule that governs the petitioner's claim. If so, the habeas court gauges whether the state court decision is `contrary to' the governing rule."). Thus, once a court following O'Brien finds that Supreme Court precedent dictated the applicable legal rule in a case, the court would engage in plenary review to determine whether, in its opinion, the state court decision correctly applied the precedent, even if the Supreme Court had not indicated how the rule should be applied in similar contexts. This result is facilitated by O'Brien's elastic formulation of the "contrary to" standard.

Of course, where the Supreme Court has indicated how the law should be applied to the facts, a state court decision ignoring the Court's directions is ipso facto unreasonable and "contrary to" clearly established precedent. But by proposing to apply plenary review beyond the scope of direct Supreme Court precedent, and leaving the concept of reasonableness out of the first stage of its inquiry, O'Brien underemphasizes the deference S 2254(d)(1) requires federal habeas courts to give to state court decisions. This approach gives greater flexibility for the application of plenary review than is available under Green, as Green would require the habeas court to consider only whether the state court's application of the precedent was reasonable.

A good example of this is an ineffective assistance of counsel claim under Strickland. See Stevens v. Maloney, 32 F. Supp. 2d 478 (D. Mass. 1998). In Stevens, the defendant's attorney failed to file a written motion challenging the pre trial use of a photographic array with

40

an eyewitness. In considering the habeas petition claiming ineffective assistance of counsel, the district court, applying O'Brien, first concluded that Strickland v. Washington, 466 U.S. 668, 687, 694 (1984), sets forth a rule directly applicable to the case. See Stevens, 32 F. Supp. 2d at 481. The court therefore applied "contrary to" review under O'Brien and inquired whether the state court decision was correct, not whether it was a reasonable application of Strickland. See Stevens, 32 F. Supp. 2d at 481–82. Under Green, by contrast, the district court would have been limited to considering only whether the state court's application of Strickland was reasonable, since the Supreme Court has not specified how Strickland should be applied to such claims.2

This expanded role for plenary review under S 2254(d)(1) in O'Brien is inconsistent with the text and legislative history of AEDPA. First, I do not think that it is consistent with a common sense understanding of when a state court decision is "contrary to" clearly established Supreme Court precedent. Under O'Brien, a federal habeas court would be able to grant relief under S 2254(d)(1) solely because it disagreed with the state court's application of the appropriate Supreme Court precedent, even though it was a reasonable interpretation of how the Supreme Court would have applied the precedent. I do not think such a reasonable interpretation could fairly be denominated "contrary to" clearly established Supreme Court precedent. As the majority itself recognizes in the context of the "unreasonable application of " clause,S 2254(d)(1) "does not empower a habeas court to grant the writ merely because

_____

2. Judge Stapleton's concurrence also provides an example of the problem with the majority's approach. Judge Stapleton, contra the majority, would apply plenary "contrary to" review to the state court's decision that Lubking did not deliberately elicit statements from Matteo. Although he reaches the correct result, he does so only because he concludes that, reviewed de novo, the state court's conclusion was correct. I agree with the majority, however, that the proper framework for analysis in this case is deferential review under the "unreasonable application of" test. Judge Stapleton's concurrence simply demonstrates the ambiguities inherent in the majority's approach, which lead to the lack of deference that I think is inappropriate.

41

it disagrees with the state court's decision, or because, left to its own devices , it would have reached a different result." Slip Op. at 20 (quoting O'Brien, 145 F.3d at 25).

Furthermore, Congress's express intent in enacting AEDPA demonstrates that the reduced deference O'Brien permits is inappropriate. That S 2254(d)(1) requires a habeas court to give deference to reasonable state court decisions where the Supreme Court has not spoken directly to an issue is evident from Senator Hatch's explication of the provision:

> What does this mean? It means that if the State court reasonably applied Federal law, its decision must be upheld. Why is that a problematic standard? After all, Federal habeas review exists to correct fundamental defects in the law. If the State court decision has reasonably applied Federal law it is hard to say that a fundamental defect exists.

141 Cong. Rec. S7848 (daily ed. June 7, 1995). Similarly, Senator Specter recognized that "under the bill deference will be owed to State courts' decisions on the application of Federal law to the facts. Unless it is unreasonable, a State court's decision applying the law to the facts should be upheld." 142 Cong. Rec. S3742 (daily ed. April 17, 1996). Given these statements, I do not think it is appropriate to apply plenary review to state court decisions applying clearly established legal principles in contexts that the Supreme Court has not directly addressed.

While distancing itself from O'Brien's treatment of the "unreasonable application of " facet ofS 2254(d)(1),3 the

_____

3. I agree with the majority that, in the context of the "unreasonable application of" inquiry, the federal habeas court must apply an objective standard, and examine the reasonableness simpliciter of the state court decision. See Slip Op. at 21. The definitions of reasonableness that other courts, including Green, 143 F.3d at 870, have announced, see, e.g., Nevers v. Killinger, ___ F.3d ___, No. 98-1039, 1999 WL 97993, at *10 (6th Cir. Mar. 1, 1999) (relying on O'Brien, Green and Drinkard), which the majority terms "subjective," require too much deference to state court decisions and therefore are inconsistent with Congress's intent and the case law out of which S 2254(d)(1) arose. Just as the majority rejects this aspect of O'Brien, I would decline to adopt this aspect of Green.

42

majority appears to adopt explicitly O'Brien's treatment of the "contrary to" clause. If the majority is not adopting this aspect of O'Brien, it would, I assume, inquire into whether the state court reasonably determined the manner in which the rule should be applied to the particular facts, if it found a Supreme Court rule on point but the Supreme Court had not applied that rule to particular facts. But even so, the fact of this ambiguity, along with the language of the majority, suggests a lower level of deference to state court decisions than is properly required by Green.

II.

In addition to the decreased deference O'Brien permits federal habeas courts to give to state court decisions, I think the Green approach provides a more useful framework for future federal habeas courts engaged in review of state court decisions under S 2254(d)(1). More specifically, it focuses the habeas court's attention on the precise nature of the issue the state court decided and its relation to clearly established Supreme Court precedent. For example, by focusing on the inquiry whether "through a decision of pure law . . . [the state court] decision reaches a legal conclusion or a result opposite to and irreconcilable with that reached in the precedent that addresses the identical issue," 143 F.3d at 870, the Green approach focuses the habeas court's attention on whether the state court decision of a legal issue is properly reconcilable with precedent. Similarly, by focusing on whether a state court "decision recognizes the correct principle from the higher court's precedent, but unreasonably applies that principle to the facts before it (assuming the facts are insufficiently different from those that gave rise to the precedent as to constitute a new context for consideration of the principle's applicability)," 143 F.3d at 870, the rule properly focuses the habeas court's attention on whether the state court reasonably distinguished or failed to distinguish the facts of the case under review from the precedent.

The majority criticizes the Green approach for setting out different frameworks for addressing different sorts of questions, contending that this may lead to confusion on the part of federal habeas courts. "Although we find th[e

43

Green court's] analysis insightful, we decline to adopt it as the basis for scrutinizing state court judgments under AEDPA. We believe that, in practice, it will be difficult for a court to determine which, if any, of the foregoing scenarios is implicated in the case before it." Slip Op. at 19. Without further explication of this ipse dixit, however, I am unsure why the majority thinks the Green approach would be difficult to apply. I prefer the Green approach precisely because it attempts to provide at least some analytical structure beyond simply restating S 2254(d)(1), as O'Brien and the majority do. The rare cases in which it is difficult to determine which of the Green categories is relevant are hardly reason for abandoning such a useful framework.

III.

Although I would apply Green, I agree with the majority's application of S 2254(d)(1) to this case, for under either Green or O'Brien the state court's decision was not "contrary to, [nor did it] involve[ ] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." See 28 U.S.C. S 2254(d)(1). Therefore, I concur in the judgment of the Court.

44

STAPLETON, Circuit Judge, concurring:

I join in Parts I and II of Judge Scirica's opinion, and I agree that (i) Matteos Sixth Amendment right had attached at the time of his conversations with Lubking, (ii) no violation of Matteos Sixth Amendment right occurred, and (iii) any error would be harmless. I write separately to emphasize the importance and utility of interpreting AEDPA in light of Teague v. Lane, 489 U.S. 288 (1989) and related Supreme Court caselaw.

I.

The court appropriately seeks to read the AEDPA provisions at issue in a manner that "comports with pre-AEDPA law in this area, which was governed primarily by Teague." Slip Op. at 23. Indeed, the overall interpretative approach urged by the O'Brien court, and largely adopted here, rests on the notion that AEDPA was conceived in the spirit of Teague. See, e.g., O'Brien v. DuBois, 145 F.3d 16, 23 (1st Cir. 1998) (explaining that S 2254(d)(1) "perpetuates" the teachings of Teague and its progeny through a "sort of choice of law provision" that "closely emulates Teague."). I agree that a careful consideration of Teague and the Supreme Court cases following it should inform our interpretation of S 2254(d). I write separately to emphasize that the Teague body of caselaw provides a well-developed analytical framework for determining whether a habeas petition governed by AEDPA should be analyzed under the "contrary to" or the "unreasonable application of " standard of S 2254(d)(1). This initial determination by the habeas court is pivotal, as it represents a decision as to which of two substantially different standards of review should govern its consideration of the state court's determination.

Echoing O'Brien, the majority opinion explains that "the `contrary to provision of AEDPA requires a federal habeas court first to identify the applicable Supreme Court precedent and determine whether it resolves the petitioners claim." Slip Op. at 19. The difficulty lies in determining whether the Supreme Court has articulated a rule specific enough to trigger "contrary to" review. Although the statute

45

provides little guidance, the Teague body of caselaw is particularly instructive in this endeavor.

Teague established the general rule that (with narrow exceptions1) "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." Teague, 489 U.S. at 310. Under the Teague scheme, a habeas court exercises plenary review only insofar as the petitioner seeks relief on the basis of jurisprudence existing at the time the petitioner's conviction became final. If the petitioner either seeks relief on the basis of a "new rule" (i.e., a decision issued after the conviction became final) or seeks relief that would require the habeas court to announce (and retroactively apply) a new rule, Teague sharply restricts the habeas court's review. In the interests of "comity, predictability, and finality," Stringer v. Black, 503 U.S. 222, 228 (1992), Teague requires habeas courts to defer to "reasonable, good-faith interpretations of existing precedents by state courts, even though they are shown to be contrary to later decisions." Butler v. McKellar, 494 U.S. 407, 414 (1990).

Under Teague, the habeas court first must determine whether the relief sought by the petitioner would constitute a "new rule." If it would, the relief is barred and a (reasonable) state decision will stand; if, on the other hand, the relief sought is sufficiently within the scope of then-existing jurisprudence to be considered "dictated by precedent," Teague permits the habeas court to grant the relief. Like this "new rule" inquiry under Teague, which considers whether the relief sought is dictated by precedent, the initial inquiry under AEDPA considers whether the relief sought is governed by clearly established Supreme Court law. Under AEDPA, as under Teague, the habeas court's plenary review powers exist only if the relief

_____

1. Under Teague, the habeas court may also consider a new rule of law in two exceptional circumstances: first, if the rule places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe," Teague, 489 U.S. at 307; or second, if the rule "requires the observance of procedures that are implicit in the concept of ordered liberty." Id. at 311.

46

the petitioner seeks is governed by clearly established law. Under AEDPA, as under Teague, if the result sought is not "dictated by precedent," the habeas court must defer to the state court's reasonable application of prevailing law. Thus, the analysis under AEDPA of whether the Supreme Court has articulated a rule specific enough to trigger "contrary to" review may be guided by the standards already established, under Teague, for determining whether the existing precedent (i.e., old rules) govern the petitioner's claim (or, put differently, whether the relief sought would constitute a new rule).

Since Teague, the Supreme Court has wrestled repeatedly with the question of when a "rule" -- articulated in a case decided after the petitioners conviction becamefinal -- should be considered "new" and thus inapplicable to the (subsequent) petition. In this context, the Supreme Court has explained that "a case announces a new rule when it breaks new ground or imposes a new obligation on the [government]." Id. at 301. In addition, the Supreme Court has explained that the principles of Teague also apply if a petitioner, although relying on an "old" rule, seeks a result in his case that would create a new rule "because the prior decision is applied in a novel setting, thereby extending the precedent." Stringer, 503 U.S. at 228. This analysis is particularly apt here. Put differently, under Teague, the Supreme Court directed habeas courts to consider whether the result -- either sought by the petitioner through the application of an old rule, or achieved in another case through the establishment of an arguably new rule-- was "dictated by precedent existing at the time the defendants conviction became final." Teague, 489 U.S. at 301. Compare, e.g., Saffle v. Parks, 494 U.S. 484 (1990) (new rule would be established where prior case dictated only what mitigating evidence the jury must be permitted to hear, and petitioner sought rule -- not compelled by prior cases -- establishing how the evidence must be considered) with Stringer v. Black, 503 U.S. 222 (1992) (no new rule established where the prior cases rule "emerges not from any single case . . . but from our long line of authority" on the matter and, despite differences in the petitioners case, the result petitioner seeks "follows a fortiori" from the earlier case).

47

Thus, out of deference to state court decisions, Teague requires habeas courts to refrain from judging state determinations according to rules (or results) that were not dictated by existing precedent. Similarly, out of the same concern for state court adjudications, S 2254(d)(1) requires habeas courts to employ a deferential, "reasonableness" standard of review unless the Supreme Court has articulated a rule that, "by virtue of its factual similarity . . . or its distillation of general federal law precepts into a channeled mode of analysis . . . can fairly be said to require a particular result in a particular case." Slip Op. at 20 (quoting O'Brien, 145 F.3d at 25). In the latter case, under AEDPA, the habeas court does not consider simply the objective reasonableness of the state decision, but rather determines whether it was "contrary to" such clearly established Supreme Court law.

The difficult initial inquiry under AEDPA -- whether the Supreme Court has articulated a rule specific enough to trigger "contrary to" review -- is thus guided by the well-developed Teague caselaw, which is aimed toward the same end, and in which jurisprudential context Congress enacted AEDPA. Accord O'Brien, 145 F.3d 25 (noting that "[n]ot coincidentally, the Courts pre-AEDPA habeas case law employed this approach in conducting Teagues "new rule" inquiries, and other federal courts have followed this praxis (wisely, we believe) when construing section 2254(3)(1).") (citations omitted). For example, the habeas court must not require the petitioner to point to a factually identical precedent in order to obtain review under the "contrary to" prong, just as, under Teague, a petitioner who sought to apply an old rule to a new factual setting was not necessarily barred by Teague. As Justice Kennedy has explained:

> "If the rule in question is one which of necessity requires a case-by-case examination of the evidence, then we can tolerate a number of specific applications without saying that those applications themselves create a new rule. . . . Where the beginning point is a rule of this general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a

48

    result so novel that it forges a new rule, one not
    dictated by precedent."

Wright v. West, 505 U.S. 277, 308 (1992) (J. Kennedy, concurring).

II.

The issue presented in this case -- deliberate government elicitation of incriminating statements in the absence of counsel -- is one in which the Supreme Court has provided a well-established principle for resolution. Guided by Teague, I would analyze Matteos claim under the"contrary to" prong of S 2254(d)(1) and conclude that the state courts decision was not contrary to clearly established Supreme Court law.

Although no Supreme Court case has addressed precisely the facts presented here, Massiah and subsequent cases illustrate the fact-dependent nature of the Massiah rule. After Massiah, in which statements made in a car by a defendant not in custody were "deliberately elicited" in violation of the Sixth Amendment, United States v. Henry, 447 U.S. 264 (1980) established that statements made in a cellblock to a paid informant were impermissible under the same theory. Subsequently, Maine v. Moulton, 474 U.S. 159 (1985) established that the same rule applied to surreptitiously recorded statements between codefendants, and Kuhlmann v. Wilson, 477 U.S. 436 (1986) drew the line at statements wholly volunteered with no hint of elicitation. In other words, each case in this line embellished the Massiah rule with new factual predicates.

Regardless of whether Henry, Moulton or Kuhlmann established a new rule when each was decided, given the constellation of factual settings and commentary these cases now provide, coupled with the necessarily fact-dependent nature of the analysis, the application of this line of cases to Matteos claim would not, in my view, result in a new rule under Teague. The facts of this case are not sufficiently different from those in the Massiah line of cases to require an extension or modification of the legal principles set forth in that caselaw. As such, drawing on Teague, I conclude that the Massiah caselaw "governs" or

49

"dictates" a result in Matteo, thus triggering "contrary to" analysis under S 2254(d)(1).

Having determined that the proper inquiry is whether the state decision is "contrary to" clearly established Supreme Court law, I would conclude that neither phone conversation between Lubking and Matteo violated the Massiah rule against deliberate elicitation. Although the second conversation contains some direct questions from Lubking as to the location of the rifle, this conversation must be viewed in the context of the first and in terms of its substance, rather than its format. Matteo initiated both conversations for his own purpose -- to get Lubking to recover (and hide) the rifle. Lubking was unsuccessful in finding the rifle based on the directions Matteo gave during the first call, and when Matteo called a second time to inquire whether the rifle had been located, Lubking informed him of this fact. Predictably, he volunteered more specific directions in order to assure that his purpose would be achieved. In this context, it would elevate form over substance to give controlling significance to the fact that Lubking asked an occasional clarifying question. Matteos statements were made on his own initiative, not because they were in response to anything said or urged by Lubking. Lubkings incidental questions were not "affirmative steps" to elicit incriminating information. Henry, 447 U.S. at 271.

Because I would conclude that no deliberate elicitation occurred, I would not reach the issue of whether Lubkings actions were attributable to the state. Finally, I agree that any error was harmless in light of the overwhelming evidence against Matteo.

50

McKEE, Circuit Judge, with whom Judges Sloviter and Roth join, concurring.

I agree with the majority's analysis of S 2254(d)(1), but I believe that the state court's Sixth Amendment analysis was contrary to clearly established law as decided by the Supreme Court. However, I join in the judgment of the court because I agree that the erroneous admission of the rifle into evidence was harmless in view of the quality and quantity of admissible evidence that connected Matteo to this murder. I write separately to voice my disagreement with the majority's application of the standard we are adopting. I believe that Massiah v. United States, 377 U.S. 201, 206 (1964), compels a different resolution of the agency inquiry we must undertake to resolve Matteo's claim. In Massiah, the Court held that, absent a valid waiver, a government agent may not "deliberately elicit" incriminating statements from an accused after the right to counsel has attached. In holding that the outcome of the state court's inquiry was not compelled by "clearly established Federal law" I believe we are demanding a level of precision and specificity that is neither required by the language of AEDPA, nor consistent with reasoned use of Supreme Court precedent.

I.

The majority holds that "contrary to" review is not warranted here because there is no Supreme Court case defining the term "government agent." That conclusion illustrates the many problems buried in the analytical minefield lurking beneath the surface of AEDPA. One of the unresolved issues created by AEDPA is the level of specificity the Supreme Court must use in fashioning a rule in order for it to be applied as "clearly established Federal Law" under AEDPA. In resolving that issue we must consider that rules fashioned by the Supreme Court are often intended to reach beyond the confines of the particular case in which the rule was enunciated.

In Massiah, the Court announced a specific rule which requires a case-by-case inquiry for determining whether the government has violated a defendant's Sixth Amendment

51

right to counsel. See United States v. Henry, 447 U.S. 264, 270 (1980) ("The question here is whether under the facts of this case a Government agent `deliberately elicited' incriminating statements from Henry within the meaning of Massiah.") (emphasis added). The Court has repeatedly rejected efforts to distinguish or limit Massiah's applicability. See eg. Brewer v. Williams, 430 U.S. 387, 390 (1977) ("The circumstances of this case are thus constitutionally indistinguishable from those presented in Massiah v. United States."); Maine v. Moulton, 474 U.S. 159, 179 (1985) ("reaffirm[ing] the holding" in Massiah after rejecting the state's attempt to limit it and distinguish the case on its facts); Henry, 447 U.S. at 271-72 (rejecting argument that it modified the Massiah rule in Brewer v. Williams rather than applying it to a new factual setting). Though a court must undertake a specific inquiry into the facts of the case before it, the inquiry is governed by the rule enunciated in Massiah, and I believe that rule compels a different outcome here.

In Maine v. Moulton, 474 U.S. 159 (1985), the Supreme Court succinctly stated the analysis that is required under Massiah and its progeny.

> [T]he State's attempt to limit our holdings in Massiah and Henry fundamentally misunderstands the nature of the right we recognized in those cases. The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a `medium' between him and the State. . . .[T]his guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation.

474 U.S. at 176.

There are, of course, fact patterns that transcend the parameters that can fairly be said to have been erected by Supreme Court case law. When that situation occurs Supreme Court decisions do not compel a particular result

without an extension of a particular principle. See Kuhlmann v. Wilson, 477 U.S. 436, 456 (1986) (answering in the negative the question, explicitly left open in Henry and Moulton, whether the Sixth Amendment forbids admission into evidence of an accused's statements to a jailhouse informant who was "placed in close proximity but [made] no effort to stimulate conversations about the crime charged"). However, this is not such a case.

As the majority notes, the Supreme Court has set forth factors which are "important" in determining whether the Massiah standard has been violated. Henry, 447 U.S. at 270. However, the infinite number of ways that investigators and informants can combine to elicit information from an unsuspecting defendant precludes us from establishing any litmus test for determining when an informant is acting as a government agent under Massiah. Compare Brewer, 430 U.S. 387 (police officer gave speech designed to extract incriminating responses from defendant); with Henry, 447 U.S. 264 (agent was a paid jailhouse informant who was directed not to question the defendant) and Moulton, 474 U.S. 159 (agent was a codefendant out on bail who had "cut a deal" with the government and was directed to engage the defendant). Thus, as the majority points out, the Eleventh Circuit Court of Appeals has noted that "[t]here is, by necessity, no bright-line rule for determining whether an individual is a government agent for purposes of the sixth amendment right to counsel." Depree v. Thomas, 946 F.2d 784, 793 (11th Cir. 1991) (emphasis added). See Slip. Op. at 27. "Contrary to" review cannot be reserved only for those cases that are eerily identical to Supreme Court precedent, and I do not interpret the majority's opinion as suggesting any such evisceration of "contrary to" review under AEDPA. See Slip Op. at 20.

II.

The majority's analysis focuses upon the factors which the Supreme Court relied upon in Henry infinding a Sixth Amendment violation there. In Henry, a paid informant who appeared to be no more than a fellow inmate was acting under instructions from the government to elicit

53

incriminating statements from the defendant while he was in custody. See Henry, 447 U.S. at 270. The majority emphasizes that here, there was no "quid pro quo" exchange between Lubking and the police because Lubking was "not a suspect in the crime, had little to gain by cooperating with the investigation and in fact received no compensation." Slip Op. At 30. However, Lubking believed that his rifle was the murder weapon and he cooperated to "keep himself out of trouble" and to allay his fears about being connected with the murder. App. at 153-54a, 157a, 168a, 269a, 278a, 291a. Lubking said that he contacted his lawyer, after being called by Matteo, "[j]ust to keep my butt clean." App. at 157a. When asked why he agreed to help, Lubking reiterated: "To get my name out of any problems that might have happened. I mean, really, to keep my butt clean." App. at 291a. Although Lubking did not have a "deal" with the government, his motivations make him no less capable of being an agent of the investigating authorities. Lubking was not an uninterested citizen so driven by altruism that he offered to tell police what he knew about the crime they were investigating. To be sure, Lubking was also not a coconspirator or cellmate hoping to win favors from police. However, Lubking's situation is no less analogous to cases where the Court has found an agency relationship. Rather than being paid, or being assured that his cooperation would be made known to a sentencing judge, Lubking attempted to assure himself that he would remain "clean" altogether. He had no less incentive to assist the police than one hoping for a reduced sentence, and the police made good use of his offer to assist. See Henry, 447 U.S. at 270.

Nothing in Massiah or its progeny suggests that the Supreme Court intended to restrict an agency analysis under the Sixth Amendment as narrowly as the majority's reasoning requires. The fact of an arrangement between the government and the informant pursuant to which "the informant [i]s charged with the task of obtaining information from an accused" can be sufficient to establish the agency required under Massiah. See. Henry 447 U.S. at 273. In concluding that Lubking was not acting as a government agent during either call from Matteo the majority focuses on the instructions the police initially gave

54

Lubking regarding the operation of the recording equipment, and their instructions to not directly elicit incriminating information from Matteo. If that were all that appeared on this record I would agree with the majority's conclusion that there was no agency;1 but there is more. Matteo made a second call, and Lubking's role during that call was qualitatively different from the role he played during the first call. I believe the majority fails to give sufficient weight to the totality of the circumstances surrounding Lubking's recording of the second telephone call. Moreover, both the first and second call came after Chief Deputy District Attorney Joseph Carroll had informed Lubking that "the purpose of the interception was to obtain potential evidence in a prosecution against Mr. Matteo for murder." App. at 169a. Carroll told Lubking that the police wanted to recover the gun which they believed to be the murder weapon, "but in addition I told him we are not only interested in finding the gun, but also recording the conversation." App. at 181a.

Despite the initial instructions to Lubking to act as a passive listener, Detective Sergeant Michael Carroll subsequently charged Lubking with the task of obtaining more specific directions as to the location of the rifle. The instructions that were given following the initial, unsuccessful search transformed Matteo from informant to agent. After Matteo's directions in the initial call proved insufficient to direct the police to the hidden rifle, Detective Michael Carroll escorted Lubking back to Lubking's home where Carroll knew Matteo would call a second time to check on the results of the search. Carroll explained his instructions to Lubking as follows:

> Q: What if anything did you say to Lubking regardi ng the second phone call?
>
> Carroll: I told him that I did not want him questi oning Mr. Matteo outside the area of direction to where the gun was located. I told him if he could get us more specific directions, that would be helpful. If he wasn't

---

1. If that were the situation there would still be "clearly established Federal law," but the state court's ruling that there was no agency would not be "contrary to" it.

able to get us more specific directions under the narrow area we allowed him to discuss, that that would be all right, also . . .

Q. And you said, and again you have told us this, but you said basically try to get him to be as specific as you can, but stay in that area of facts, don't go outside of those factual areas; am I correct on that?

Carroll: Yes.

App. at .243a, 248a.

Thus, Lubking's efforts to get Matteo to be more specific about where the rifle had been hidden during the second telephone call must be attributed to the government. The government told him to attempt to get Matteo to be more specific and that is what Lubking did. Matteo relied upon his relationship with Lubking to respond to Lubking's probing just as police hoped he would.

III.

This record clearly establishes that Lubking did "directly elicit" incriminating information from Matteo, and I believe the state court's conclusion to the contrary is "contrary to" the conclusion that is required by Massiah, Henry, and their progeny. Lubking, no less than the informant in Henry, was more than a "listening post" during the second phone conversation. The following exchange occurred during the second telephone call:

Matteo: It's Anthony. What's up?

Lubking:I couldn't find it. You oughta get-- I need more explicit -- this is --

Matteo: What did you say?

Lubking: I couldn't find it.

Matteo: What do you mean you couldn't find it?

Lubking: Well, you said the bridge.

Matteo: Yeah.

Lubking: And there's two bridges there. There's a sewer pipe and there's --

56

        * * *

        Matteo: Yeah. It goes under that cement bridge.

        Lubking. Yeah. On the far side, on the side all the way closer to your house?

        * * *

        Lubking: . . . I looked there too, but they -- is it in the water?

         * * *

        . . . So it's not in the grass?

         * * *

        . . . So it's almost underneath the bridge?

         * * *

        . . . Was the water frozen when you dropped it?

App. at 141a-147a. Unlike the first conversation where, as the majority states, Lubking said "virtually nothing at all " in response to Matteo's directions, see Slip. Op. at 33, Lubking took "affirmative steps" during the second conversation to elicit information about the exact location of the rifle. See Kuhlmann, 477 U.S. at 459 (defendant may establish a constitutional violation by "demonstrat[ing] that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks."). These questions were more than "a few clarifying questions." Slip. Op. at 34. They were pointed inquiries prompted by Detective Carroll's need for more specific information. In Henry, the Court stated: "By intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel." 447 U.S. at 274. Here, all that is necessary is to substitute "Matteo" for "Henry." Lubking's "monosyllabic rejoinders," Slip. Op. at 33, during the second conversation cannot transform his role into that of a listening post. Indeed, insofar as the location of the rifle was concerned, he was more of an interviewer.

Nor am I persuaded by the majority's attempts to distinguish this case from Moulton. Given the circumstances here, it is immaterial that Matteo voluntarily called Lubking. See Moulton, 474 U.S. at 175-75 (noting that "the identity of the party who instigated the meeting at which the Government obtained incriminating statements [is] not decisive or even important"). The fact that Matteo sought to discuss the location of the gun does not preclude a finding that the information was surreptitiously obtained. As the Supreme Court noted in Moulton, once the government is aware that the sole topic of discussion between the agent and the accused is going to be the pending charge, "a Sixth Amendment violation[i]s inevitable." Id. at 177 n.14. Here, as in Moulton, the government "knowing[ly] exploit[ed]" an opportunity to confront Matteo in the absence of counsel in violation of his Sixth Amendment rights. Id. at 176.

V.

I applaud the majority's efforts to extract a workable standard from this inartfully drafted statute even though I disagree with the majority's conclusion. The Supreme Court's metaphorical retort that AEDPA is not exactly a "silk purse," see Slip. Op. at 18, is all too accurate. The difficulty of interpreting this statute is evidenced by the number of competing interpretations given the statute by the courts of appeals that have interpreted it, as well as by the divergent views expressed here. Although it is not implicated here, I cannot help but express concern that such an elusive and inartful statute will often be the basis for deciding if someone was "properly" sentenced to death in a state court. Given the divergent interpretations of this statute one can only hope that Congress will clarify its intent, or that the Supreme Court will provide a single explanation of it.

However, that day is not yet here and, as noted above, that problem is not implicated here. I am convinced that the state court's holding in this case was "contrary to" the "clearly established" rule of Massiah. However, I concur in the judgment of this Court because the resulting error was harmless.

58

RENDELL, Circuit Judge, Concurring

I concur in the result we reach in this case, because the somewhat different analysis I propose, and the variation on the test I advocate, would nonetheless lead to the same result in this case -- affirmance of the District Court's denial of habeas relief.

I caution, however, that our analysis of the standard, as applied to the facts of the case, may well consider too casually the entire AEDPA test and, in dealing with the issues, lose the necessary focus. I also part ways with the need to define "unreasonable application" as we do in the majority court's opinion.

I suggest we adhere closely to the statutory dictate that the threshold through which review must pass is clearly established Supreme Court precedent. Only if the Supreme Court has ventured into a pertinent area of the law that formed the basis for the state court's decision or reasoning do we have the power of review. As a practical matter, using this as a starting point, we can, as here, eliminate many of an appellant's contentions at the outset. I note that while I hesitate to critique a colleague's thoughtful analysis, I think we need to endorse an approach that is clear and easy to apply, so as to give guidance to the lower courts in this area.

As we indicate at the outset of the majority opinion, we must determine whether "the adjudication of the claim (by the state court) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." The inquiry, therefore, should begin by identifying what the state court decided and what, if any, clearly established federal law, as determined by the Supreme Court of the United States, has a bearing on the decision rendered by the state court. We may act only if the state court's decision is either contrary to or involved an unreasonable application of clearly established Supreme Court precedent.

In the instant case, clearly Massiah and its progeny have a bearing on the outcome. What clearly established principles that are set forth in the Massiah line of cases

bear on the decision reached by the state court? I suggest that even though the state court determined that Lubking was not an agent because he was a volunteer and there was no agreement or "quid pro quo" for the information he gave, we needn't dwell on the issue of agency. Although the majority opinion discusses the agency relationship involved in the Henry opinion, the Supreme Court has made no pronouncement, in Henry or in any other decision, as to when an individual is or is not an "agent" under this line of cases. Its statement in Henry that the combination of circumstances -- namely, a paid informant pretending to be a fellow inmate -- was "sufficient to support" the court of appeals' determination that the individual was an agent for the government hardly equates to clearly established Supreme Court precedent on this issue.[1]  See United States v. Henry, 447 U.S. 264, 270-71 (1980). The majority opinion correctly notes that the concept of "clearly established federal law, as determined by the Supreme Court of the United States" requires that we not entertain habeas corpus relief based on the state court's"failure to adhere to the precedent of a lower federal court on an issue that the Supreme Court has not addressed." If we lose sight of this requirement in our analysis, we stray from the dictates of the statutory language, and I submit that the resulting inquiry into "contrary to" and "unreasonable application" can easily lead to a form of plenary review. Therefore, since the Supreme Court has not addressed the issue of the parameters of agency for purposes of Massiah, there is no federal law as determined by the Supreme Court on this issue, let alone any "clearly established" law. Even if a determination of the state court as to agency were pivotal in its adjudication and its decision, we need not examine this aspect, because the Supreme Court jurisprudence on the issue is nonexistent.

Clearly, the issue in Massiah and its progeny that has bearing on this case is the question of what constitutes

_____

1. Even in O'Brien the court noted that the Supreme Court pronouncement should set a "governing rule" or "erect a framework specifically intended for application to variant factual situations." O'Brien
v. Dubois, 145 F.3d 16, 24-25 (1st Cir. 1998). The Supreme Court has not done this in the agency context.

"deliberate elicitation." We must, therefore, ask, first, what is the federal law as determined by the Supreme Court regarding this issue, and, assuming the Supreme Court has addressed it, determine whether the law is "clearly established." The Supreme Court has in fact "erected" the necessary "framework" in the case law. We then position the state court's decision alongside the Supreme Court precedent, to determine if the decision itself is "contrary to" the dictates of that precedent, and, if not, whether the adjudication of the claim involved an "unreasonable application" of the precedent.[2] I reach the same result as the majority opinion by proceeding in this fashion in this case because the Supreme Court has established the framework, and the state court's decision was neither contrary to it, nor an unreasonable application of it. I suggest that the focus on Supreme Court precedent and the pointed inquiries is the essence of the narrower review envisioned by the statute, and will prevent us from venturing into the forbidden area of whether we agree with the state court decision -- which the majority opinion seems to do as it works through the elements, and, indeed, at the conclusion of its analysis.

In addition, unlike the majority, I would embrace the statutory language regarding "unreasonable application" as the standard and decline, as we and most other circuits have done, to dwell on interpreting it, for as we redefine it, it loses its meaning. I read the statute as permitting us to examine whether the state court, as it applied the Supreme Court precedent to the case at hand, applied the law in an unreasonable manner. This may well be different from

_____

2. I submit that a more focused look at whether the precise issues have been addressed by the Supreme Court, and, if so, a comparison of the Supreme Court dictates in order to answer the "contrary to" question, might well reduce the concerns expressed by Chief Judge Becker as to the potential for expansive, plenary review at this stage. While I agree with our preference for the standard wherein we ask what does the Supreme Court's pronouncement require or dictate, as opposed to the standard requiring near identicality, if we zero in on particular pronouncements by the Supreme Court that are clearly established, I wonder whether the result of the exercise we engage in will be all that different under one or the other.

asking whether the outcome reached by state court "cannot reasonably be justified," or the outcome is not "objectively reasonable." (In fact, I even view these two standards employed in the majority opinion as somewhat different from each other.) If it is not different, why the need to interpret it further?

The statutory test is whether the adjudication that resulted in the decision "involved an unreasonable application," and I suggest that this says it all.3 The majority opinion has, as have other circuits, imposed a negative spin, namely, that no jurist would disagree, or debate, or that an outcome cannot reasonably be justified, whereas the language does not require or compel this. If anything, "objectively unreasonable" -- as used at the end of the majority's analysis -- comes closer to the mark than does "cannot reasonably be justified." However, we have adopted the latter as the standard. I would leave the door open for the federal courts to do exactly what the statute dictates, namely, to determine whether the adjudication involved an unreasonable application. I think any attempt to define the phrase in more absolute terms impermissibly rewrites the statutory language.4 I would suggest further

_____

3. We could debate at length whether and to what extent the discussions of Teague in recent Supreme Court cases should influence our view of the statutory language. See Wright v. West, 505 U.S. 277, 290-94 (1992); 505 U.S. at 303-05 (O'Connor, J., concurring); 505 U.S. at 306-09 (Kennedy, J., concurring); 505 U.S. at 311-13 (Souter, J., concurring); Butler v. McKellar, 494 U.S. 407, 412-16 (1990); 494 U.S. at 417-22 (Brennan, J., dissenting); see also Teague v. Lane, 489 U.S. 288, 308-14 (1989). I only note that Congress, presumably aware of the numerous ways in which to describe the confined nature of the inquiry as set forth in Butler v. McKellar and Wright v. West, nevertheless employs the term "unreasonable application," not "patently" or "clearly" unreasonable, with no reference to good faith or debate by reasonable jurists. Cf. 141 Cong. Rec. S7803-01, S7836, S7844 (daily ed. June 7, 1995) (remarks of Sen. Biden regarding significance of Wright v. West); 141 Cong. Rec. S7803-01, S7878-79 (daily ed. June 7, 1995) (remarks of Emergency Committee to Save Habeas Corpus, reproduced in the Congressional Record). In a departure from the more convoluted route taken by other courts of appeals, the Ninth Circuit Court of Appeals has taken a straightforward reading of the terms included in section 2254(d)(1). See Davis v. Kramer, 167 F.3d 494, 500 (9th Cir. 1999).

4. In fact, it is curious that the other courts of appeals concentrate on other jurists' agreeing, or not agreeing, and we talk in terms of "objective

that by the use of the word "application," the statute invites us to look at the reasoning process, rather than merely answering yes or no as to whether the result can be reasonably justified.5 I would, therefore, adopt an approach to "unreasonable application" whereby the federal courts examine the footing or basis in reason of the state court ruling as an extension of Supreme Court law. Only if it is unreasonable, is it disturbed.6 I see this as different from determining whether the outcome reached by the state court cannot reasonably be justified. Rather,"unreasonable application" conjures up a different inquiry that tests whether the state court's reasoning is or is not sound.

To those who would argue that our ability to correct flawed state court reasoning violates the deference intended to be given to state court rulings, I would answer that the statutory standard is extremely deferential, even as I propose to constitute it. Congress has said that we can grant relief only if the Supreme Court has addressed a specific area, and then only if the law is clearly established, and then, only if the state court had disregarded the law or has engaged in flawed reasoning in applying it. This is, in fact, deferential.7

_____

reasonableness" and "justification," yet the statute uses the word "unreasonable," the dictionary definition of which is, "not governed by reason" or "going beyond reasonable limits." Websters II New Riverside University Dictionary 1265 (1988). These are very different concepts.

5. Nor should we lose sight of the fact that the AEDPA standard requires that we examine whether the state court decision was "contrary to," or whether the adjudication that resulted in a decision involved an "unreasonable application" of Supreme Court precedent.

6. It is at this point -- when we examine the reasoning process -- that we consider the views of lower federal courts.

7. Interestingly, the floor debates do not support a narrow reading of the concept of "unreasonable application." Both sides of the aisle appear to have viewed it as meaning that unless the state "improperly appl[ied]" clearly established Supreme Court law, the state decision would stand. Senator Hatch, one of the bill's sponsors, incorporated these very words in his explication of the law. See 141 Cong. Rec. S7803-01, S7848 (daily

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit
_____

ed. June 7, 1995). Another reading of the language was set forth by
Senator Biden, who read the proposed provision as requiring deference
if the "court decision could be described by a lawyer as being
reasonable," and claimed that "unreasonable application" was so limiting
as to deprive the federal courts of their power. See Cong. Rec. S7803-01,
S7841(daily ed. June 7, 1995). At the least, these views do not support
a need for further definition or restriction of the statutory language.